UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| **CURTIS F. SAMPLE, JR.,** | |
| Petitioner, | |
| v. | NO. 2:17 CV 40 |
| **SUPERINTENDENT,** | |
| Respondent. | |

## OPINION and ORDER

Curtis F. Sample, Jr., a prisoner without a lawyer, filed a habeas corpus petition to challenge his convictions for attempted murder and criminal confinement under Cause No. 45G02-602-FA-10. Following a jury trial, on October 22, 2008, the Lake Circuit Court sentenced Sample as a habitual offender to ninety-five years of incarceration.

**I.     FACTUAL BACKGROUND**

In deciding this habeas petition, the court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Court of Appeals of Indiana summarized the evidence presented at trial:

> In the summer of 2005, C.W. began taking care of her daughter's Gary apartment while her daughter worked in another state. By January of 2006, C.W. had vacated her own apartment and moved into her daughter's apartment. During that time, Sample, who was known to C.W. by his nickname, B.C., possessed a key to the apartment. C.W.'s daughter, who had been dating Sample, had given him the key before she moved.

Before moving into the apartment, C.W. had met Sample on several occasions while visiting her daughter. After moving into her daughter's apartment, C.W. twice encountered him. The first time, he let her into the apartment after she had locked herself out. The second time, she came home and discovered him with a woman in one of the bedrooms. C.W. made Sample leave the apartment. Although she later asked her daughter and son to get the key back from Sample, he never returned it.

During the early morning of January 9, 2006, C.W. "was awakened by the presence of BC in the apartment." When asked what he was doing there, he replied that he needed somewhere to stay. C.W. informed him that he could not stay there and began following him down the hallway to the living room, "thinking he's going to go on out the door." He, however, turned and "back handed" her, cutting her face with his ring. He then pulled out a large pocket knife and ordered her to go in the living room and lie down on the floor. She did as she was ordered, lying near the front door. Sample then went into the kitchen and retrieved a butcher knife.

As Sample was examining the knife, running "his thumb and forefinger … up and down the blade as if to examine how sharp it was," C.W. fled the apartment. As she fled down a common hallway, C.W. "could feel the knife going in [her] back." She fell outside a neighbor's door and started screaming. After she fell, Sample "went to jab at [her] with the knife." C.W., however, grabbed the blade. As she was still holding onto the blade, Sample "pulled [her] hair back, took the knife, and went around [one] ear and tried to go to the other side of [her] ear" with the knife. After the knife's blade broke, Sample began hitting C.W.'s head with his fist. He then pulled the pocket knife out of his pocket and began cutting her with it. During the attack, C.W. was screaming "and fighting with him."

At approximately 1:30 a.m., Gary Police Officer Anthony Hawkins received a dispatch for "a rape and stabbing in progress." When he arrived at the main entrance to the apartment building, he "saw two people inside, one person ran towards the back, the other one was a black female. She was standing there, completely naked, covered in blood, huddled in the corner of the hallway." Officer Hawkins radioed to fellow officers that the suspect had fled toward the back of the building.

Officer Mark Davis observed Sample run out of the rear of the apartment building. He noticed that Sample's clothing "was heavily stained in blood, in what appeared to be blood." After a brief foot chase, Officer Davis cornered Sample in an alley and took him into custody. A search of Sample revealed "a folding knife stained with blood" in his pocket.

> Once officers took Sample into custody, Officer Hawkins went back to the apartment building and followed the route taken by Sample, "looking for anything that might have been dropped or thrown out" because he had seen Sample discarding items during the chase. Officer Hawkins discovered "parts to a knife" lying in "a large area of blood in the hallway."
>
> Paramedics transported C.W. to the hospital, where she received several stitches to the wounds on her face, neck, chest, and hands. Subsequently, C.W. identified Sample from a photographic array.

(DE # 9-5 at 2-4; *Sample v. State*, 910 N.E.2d 1290 (Ind. Ct. App. 2009).)

Sample argues that he is entitled to habeas corpus relief, alleging that: (1) his trial counsel failed to challenge the charging information; (2) the trial court improperly denied him jury instructions on self-defense; (3) the prosecution introduced evidence in violation of the trial court's order; (4) the evidence did not support the criminal confinement conviction; (5) the jury instructions did not advise the jury of their right to determine the law; (6) his sentencing on both convictions violates double jeopardy principles; (7) the admission of 911 tapes violated his rights under the Confrontation Clause; and (8) the trial court improperly admitted prejudicial photographs of Sample.

## II. PROCEDURAL DEFAULT

Before considering the merits of a habeas petition, the court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). To avoid procedural default, a habeas petitioner must fully and fairly present his federal claims to the state courts. *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it

3

merely requires that the factual and legal substance remain the same." *Anderson v. Brevik*, 471 F.3d 811, 814–15 (7th Cir. 2006) (citing *Boyko*, 259 F.3d at 788). It does, however, require "the petitioner to assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." *Lewis*, 390 F.3d at 1025 (internal quotations and citations omitted). "This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Id.* "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Id.*

Sample did not present any of his claims to the Indiana Supreme Court. (DE # 9-17, 9-15.) Though he raised objections to the admission of evidence and jury instructions in his petitions for transfer, these objections related solely to the determination that he was a habitual offender, and Sample does not challenge that particular determination here. Because he did not fully and fairly present his claims through one full round of State court review, his claims are procedurally defaulted.

A habeas petitioner can overcome a procedural default by showing both cause for failing to abide by state procedural rules and a resulting prejudice from that failure. *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *Wrinkles v. Buss*, 537 F.3d 804, 812 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 2382 (2009). Cause sufficient to excuse procedural default is defined as "some objective factor external to the defense" which prevented a petitioner from pursuing his constitutional claim in state court. *Murray v. Carrier*, 477 U.S. 478, 492

4

(1986). A habeas petitioner can also overcome a procedural default by establishing that the court's refusal to consider a defaulted claim would result in a fundamental miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536 (2006). To meet this exception, the petitioner must establish that "a constitutional violation has resulted in the conviction of one who is actually innocent of the crime." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Sample does not argue that he was prevented from pursuing the procedurally defaulted claims in State court nor does he assert actual innocence to excuse procedural default. He thus cannot overcome procedural default.

Nevertheless, the respondent does not assert procedural default with respect to Sample's claims that the evidence did not support the criminal confinement conviction and the admission of 911 tapes violated his rights under the Confrontation Clause. (DE # 9 at 11-16.) The court will thus consider these two claims.[1]

## III.   STANDARD OF REVIEW

"Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (quotations and citation omitted).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[1] Notably, federal courts have some discretion to consider claims for habeas relief even if such claims are procedurally barred. 28 U.S.C. § 2254(b)(2).

5

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Woods,* 135 S. Ct. at 1376 (quotation marks and citations omitted). Criminal defendants are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A state court's determination that a claim lacks merit will not be disturbed unless no fairminded jurist could agree on the correctness of the state court's decision. *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted).

IV. **ANALYSIS**

    A. *Sufficiency of the Evidence*

Sample argues that the State court made an objectively unreasonable determination that the evidence at trial was sufficient to support the criminal confinement conviction. He argues that the evidence was necessarily insufficient because the jury acquitted him of the charge of rape.

For sufficiency of the evidence claims, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

At trial, the prosecution attempted to prove that Sample had committed seven offenses, including attempted murder, rape and criminal confinement. (Trial Tr. at 472.) The jury instructions defined rape as knowing or intentional sexual intercourse with a person of the opposite sex who has been compelled by force or the imminent threat of force. (*Id.* at 478.) Criminal confinement was defined as the knowing or intentional confinement of another person without that person's consent. (*Id.* at 484.)

The victim testified that, when Sample entered the apartment, she told him that he could not stay. (*Id.* at 79-80.) She testified that, in response, he hit her in the face, pulled out a pocket knife, and ordered her to undress and to go to her bedroom, where he engaged in sexual intercourse with her and uttered crude remarks comparing the victim to her daughter. (*Id.* at 80-84.) She testified that Sample ordered her to lie on the floor of the living room and that he went to the kitchen to retrieve another knife. (*Id.* at 84-87.) She testified that she then attempted to escape by running out of the apartment, where Sample proceeded to stab her with a kitchen knife and a pocket knife.

(*Id.*) The jury convicted Sample of attempted murder and criminal confinement but acquitted Sample of rape. (*Id.* at 501-07.)

On appeal, Sample argued that the jury could not have relied on the victim's testimony to convict him of criminal confinement because, by acquitting Sample of rape, the jury indicated that they did not believe the victim's testimony, and no other evidence supported this conviction. (DE # 9-3 at 30-31.) The Court of Appeals of Indiana rejected this claim, reasoning that sufficiency of the evidence claims require consideration of only the evidence that supported the conviction. (DE # 9-5 at 14-15.) The appellate court found that the victim's testimony provided sufficient evidence for the criminal confinement conviction. (*Id.*)

After reviewing the record, this court cannot conclude that the State courts made an unreasonable determination regarding the criminal confinement conviction. To Sample's point, the criminal confinement conviction and the rape acquittal may be difficult to reconcile because they both primarily rely on the victim's testimony. However, sufficiency of the evidence claims do not require the courts to reconcile jury verdicts in this manner. *See United States v. Powell*, 469 U.S. 57, 58 (1984) ("a criminal defendant convicted by a jury on one count could not attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count"); *United States v. Torres*, 809 F.2d 429, 432 (7th Cir. 1987). Instead, the courts are simply required to determine whether the evidence at trial supports the elements of the crime. *See Powell*, 469 U.S. at 67. At trial, the victim testified that Sample ordered her around the apartment under the threat of a knife, which provides ample evidentiary support for

8

the criminal confinement conviction. Therefore, Sample's claim regarding the criminal confinement conviction is not a basis for habeas relief.

    B.    *The Confrontation Clause*

Sample argues that the State courts made an objectively unreasonable determination by admitting recordings of 911 calls into evidence. He argues that 911 recordings violated his right under the Confrontation Clause to cross-examine the callers because the statements made in the calls were testimonial.

The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him," which includes the right to cross examine such witnesses. *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). However, this right applies only where the statements provided by the witnesses are testimonial. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). To determine whether statements are testimonial, the critical inquiry is whether or not the statements were "made for the purpose of establishing or proving some fact." *Davis v. Washington*, 547 U.S. 813, 826 (2006). In *Davis*, the Supreme Court of the United States determined that a 911 call was not testimonial, considering that the witness described the events as they happened, faced an ongoing emergency, the conversation elicited information necessary to resolve the emergency, and the informal nature of the statements. *Id.* at 827. The Supreme Court also indicated that a 911 call could evolve into testimonial statements if the statements continued after the emergency was resolved. *Id.* at 828-29.

9

At trial, the prosecution introduced audio recordings of four 911 calls:

### Call 1

**Caller:** Screaming in the background . . .

**911:** Gary 911, the address of the emergency.

**Caller:** Police, 1720, W. 5th Avenue right away. Some . . . there's a man stabbed a woman in the hallway.

**911:** In the hallway?

**Caller:** 1720 West Fifth.

**911:** Okay.

### Call 2

**Caller:** Also, also, I need an ambulance, 1720 --

**911:** Ma'am. Is this on the first floor?

**Caller:** Yes, she's been raped.

**911:** She's been raped?

**Caller:** She's been raped and stabbed. I opened the door and the man was out there stabbing the shit out of her. I thought they was fighting. I didn't know what the fuck it was.

**911:** All right, baby.

### Call 3

**Caller:** Hello.

**911:** Ma'am, we got Gary PD and fire en route.

**Caller:** Okay. The front door . . . I'm not sure if it's open but the back . . .

**911:** Can you make sure it's open?

**Caller:** The back door is open.

**911:** Where is she closer to?

**Caller:** She's right at my front door.

**911:** Near the back?

**Caller:** Yes.

**911:** Tell them the go to the back, she's right at her door, the back door is open. Did you by any chance get a description of that subject?

**Caller:** No . . . all I knew it was a man and I saw her and she was unclothed. I stuck my head out the door and saw a knife and I stuck my head back in closed it. She was screaming bloody, bloody, help me, help me, help me. Oh my god . . .

**911:** You didn't get a description of him at all.

**Caller:** No.

**911:** You never saw him in the building before?

**Caller:** No.

**911:** You didn't see which way he went?

**Caller:** He must have ran out the alley. 'Cause that back door is open. They must be out there. Is the ambulance . . . don't open that door. Is the police department out there? Don't open that door. She out there screaming.

**911:** You didn't get any of the clothing description or nothing?

**Caller:** Oh, yes, they ringing my doorbell now. If you can, can you tell them to come around to the back?

**911:** Go to the back. Tell them to go to the back.

**Caller:** You didn't get a clothing description or anything, ma'am?

**911:** No, I didn't. No description at all. It happened so fast, I just saw her laying on the ground. I really recognized her. I saw somebody around her neck. I thought they was playing until I seen the knife. The dude looked up and saw me and he kept going and he ran. Hot dog. Right here. And I'm riding down here with my baby. Okay, let me see what is going on.

**911:** Okay.

**Caller:** Thank you.

### Call 4

**911:** Gary 911, the address of the emergency please?

**Caller:** My name is [omitted]. I just called about 20 minutes ago. Here they come, they're here. My baby she told me she's not responding.

**911:** The ambulance is there now?

**Caller:** Yeah, I hear them.

**911:** Okay, baby.

**Caller:** All right.

(DE # 9-3 at 16-18.)[2]

On direct appeal, Sample argued that portions of the 911 calls were testimonial and that the unredacted admission of these calls violated his rights under the Confrontation Clause. (*Id.* at 11-20.) The Court of Appeals of Indiana rejected this claim, finding that the statements were made for the primary purpose of obtaining emergency assistance and were not testimonial. (DE # 9-5 at 7-11.) The appellate court reasoned that: (1) the calls were made during or immediately after the attack; (2) the calls

---

[2] Because no official transcript of these 911 calls has been provided, the court cites to Sample's brief on direct appeal.

described an ongoing emergency, including serious injuries and a nearby armed assailant; (3) the purpose of the questioning was to locate the victim and the assailant; and (4) the calls were informal as shown by the excited utterances from other residents regarding the ongoing emergency heard in the background. (*Id.*)

After reviewing the record, this court concludes that the Court of Appeals of Indiana correctly applied principles set forth in *Crawford* and *Davis* and arrived at the reasonable conclusion that the 911 calls did not violate Sample's rights under the Confrontation Clause. Moreover, Sample does not address why he believes this determination is unreasonable nor does he explain why he believes the 911 calls are testimonial. Likewise, Sample has not demonstrated that the 911 calls had "a substantial and injurious effect or influence in determining the jury's verdict." *See Richardson v. Griffin*, 866 F.3d 836, 845 (7th Cir. 2017). To the contrary, the record indicates that trial counsel conceded that Sample stabbed the victim during closing argument and that Sample was acquitted of rape. (Trial Tr. at 452-55, 502-03.) In sum, Sample has shown neither a constitutional violation nor resulting prejudice. Therefore, Sample's claim regarding the admission of the 911 calls is not a basis for habeas relief.

V. **CERTIFICATE OF APPEALABILITY**

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the

issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this opinion for denying habeas corpus relief, there is no basis for encouraging Sample to proceed further. For the same reasons, he may not appeal *in forma pauperis* because an appeal could not be taken in good faith.

## VI. CONCLUSION

For these reasons, the court **DENIES** the habeas corpus petition; **DENIES** a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; **DENIES** leave to appeal *in forma pauperis* pursuant to 28 U.S.C. § 1915(a)(3); and **DIRECTS** the Clerk to enter judgment in favor of the respondent and against the petitioner.

**SO ORDERED**.

Date: April 16, 2018

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT